**Ralph HOGUE, Plaintiff,**

v.

**MQS INSPECTION, INC., a Delaware corporation, Defendant.**

**Civ.A. No. 93–B–2099.**

United States District Court, District of Colorado.

Jan. 17, 1995.

Renee C. Ozer, Ozer, Ruppert & Ozer, P.C., Colorado Springs, CO, for plaintiff.

P. Kathleen Lower, William F. Schoeberlein, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendant MQS Inspection, Inc., (MQS) moves for summary judgment pursuant to Fed.R.Civ.P. 56 on plaintiff Ralph Hogue's (Hogue) claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 (ADA), for constructive discharge, and for damages. The motion is adequately briefed and oral argument will not materially assist in its resolution. I will grant defendant's motion on plaintiff's constructive discharge and punitive damages claims and deny the motion on plaintiff's remaining claims.

## I.

The following facts are undisputed unless noted otherwise. Defendant MQS is a national company which conducts non-destructive testing of weldments, valves, storage tanks, and vessels. For example, MQS may inspect steel girders before they are incorporated into a building, pipes as they are laid in the ground, and storage tanks (McMullin Aff. ¶ 2). Non-destructive testing involves five primary inspection methods: radiographic (x-ray), ultrasonic, magnetic particle, dye penetrant, and visual. Inspectors are certified in each method according to national testing standards.

Hogue was hired by the Denver office of MQS in October, 1987 as an inspector on a part-time contract basis for which he had no guaranteed hours or fringe benefits. He injured his left knee on the job in November, 1989. Hogue's treating physician found Hogue had a ten percent loss of function of the left leg from this injury. He further stated that Hogue was restricted permanently from squat-bending or kneeling on that knee with permanent maximum lifting limits of 25–30 pounds (frequently) and 50 pounds (occasionally) (Pltf.Exh. 3). Despite these restrictions, Hogue resumed work as an inspector with no apparent problems. In September, 1990, Hogue passed his Level III inspector tests and became a permanent, full-time MQS employee. He was promoted to supervisor of the Denver office on December 24, 1990.

Mr. Hogue was again injured at work on November 4, 1991, when he fell from a ladder and broke his right leg and right ankle. Hogue had surgery for his injuries a few days later. MQS' workers' compensation insurance carrier retained American International Health & Rehabilitation Services, Inc. (AIHRS), a rehabilitation consulting firm, to monitor Hogue's recovery (McMullin Depo. pp. 103–04). Hogue convalesced until April 7, 1992, when he returned to work on light duty. However, Hogue was unable to work more than a few days and left work again in late April. A second surgery fused his right ankle on May 12, 1992. After this surgery, Hogue's treating physician informed AIHRS that Hogue could return to work part time

on September 1, 1992, and full time on December 1, 1992 (Pltf.Exh. 9).

In the meantime, after Hogue's November, 1991 injury, Dennis McMullin, (McMullin) manager of the Denver MQS office, had been performing his own and Hogue's duties. To reduce his workload, McMullin appointed Craig Hager (Hager), a MQS Level II inspector, as acting supervisor on May 26, 1992. According to MQS, in late June or early July McMullin offered Hager the Denver supervisor position permanently if he took and passed his Level III certification tests in August which he did (McMullin Depo. pp. 135, 169) (Hager Depo. pp. 58, 64–65).

In August, 1992, Hogue's physician projected his return to part-time light duty work on September 1, 1992. He also prescribed a "functional capacity evaluation" (FCE) which would more fully analyze Hogue's work capabilities (Def.Exh. 5). An AIHRS report dated September 3, 1992, states that Hogue's return to work was postponed until the FCE and a job analysis could be completed (Def. Exh. 16 p. 2). The FCE concluded Hogue could not squat, kneel or balance (Def.Exh. 17 p. 300116). MQS contends that with the restrictions noted in the FCE, Hogue could not perform field inspections and, thus, could not return to the supervisor position (Def. Brief p. 6). MQS then developed a training instructor position for Hogue. However, the new position was part-time, paid less, and did not offer benefits. AIHRS prepared a job description for the new position which Hogue reviewed on December 7, 1992. The next day, Hogue filed a complaint with the EEOC charging violation of the ADA based on MQS' failure to provide reasonable accommodation and return him to the supervisor position (Def.Exh. 22). When McMullin learned that Hogue had filed an EEOC complaint, he informed Hogue that he could not return to work (McMullin Depo. pp. 190–91). Hogue states that McMullin told him the company "couldn't have this shit" and he would either be laid off or fired because of his EEOC complaint (Hogue Depo. p. 134). MQS concedes this was a mistake by McMullin and states that at MQS' direction, McMullin telephoned Hogue telling him he could return to

work (Def.Brief pp. 7–8). McMullin confirmed the phone conversation with a letter (McMullin Depo. pp. 190, 192).

Hogue returned to work at MQS in the training instructor position on January 18, 1993 (Complaint ¶ 35). Shortly after he returned to work, Hogue was assigned a field inspection job after Hager reviewed the physical requirements of the job (Hager Depo. p. 101). The job extended over January and February, 1993 for one to two days per week. It entailed walking in a cow pasture where explosions had been set off and walking down a rough, eight-foot deep pit without assistance (Hogue Depo. pp. 81–83). McMullin states Hogue performed the job adequately (McMullin Depo. p. 195).

Two months later, on March 23, 1993, Hogue took medical leave for an operation on his left knee which he had injured in 1989. He returned to work at the end of May, 1993 (Hogue Depo. pp. 126–27). In June 1993, Hogue was contacted by Mike Fraser, a former MQS employee who had recently gone to work for North American Inspection, an MQS competitor. Fraser asked Hogue if he was interested in being a branch manager for North American (Hogue Depo. p. 55). Hogue was then contacted by Wes Shakley, North American's general manager (Hogue Depo. p. 55). The two men discussed the position at North American and Hogue inquired about benefits (Hogue Depo. p. 56). A few days later, North American's vice president, Carl Dichler met with Hogue and offered him a job. Hogue considered the job offer for a week and a half before accepting the offer. He resigned from MQS on a Friday and started work at North American the following Monday (Hogue Depo. pp. 58–59).

## II.

■ Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir.1980); Fed. R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

■ Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence present in the motion and response. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. at 2512; *Mares*, 971 F.2d at 494.

## III.

### A. Americans with Disabilities Act

MQS requests summary judgment on Hogue's claim that MQS violated the Americans

with Disabilities Act, (ADA) 42 U.S.C. § 12111 et seq., by refusing to accommodate his disability. MQS contends Hogue is not a "qualified individual with a disability" and, thus, is not entitled to ADA protection. Further, MQS argues that even if Hogue were a "qualified individual with a disability," his suggested accommodations were unreasonable. In any event, MQS asserts the supervisor position was filled when Hogue returned to work. I deny summary judgment on these grounds.

The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual ... in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is an "individual with a disability" who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8); *see School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987).

■■■ To qualify for the protection of the ADA, a plaintiff must establish that: "(1) he is a disabled person within the meaning of the ADA; (2) he is qualified, that is, with or without reasonable accommodation [ ], he is able to perform the essential functions of the job; and (3) the employer terminated him because of his disability." *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995) citing *Mason v. Frank,* 32 F.3d 315, 318–19 (8th Cir.1994); *Tyndall v. National Educ. Centers, Inc. of California,* 31 F.3d 209, 212 (4th Cir.1994); *Chandler v. City of Dallas,* 2 F.3d 1385, 1390 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994); *Barth v. Gelb,* 2 F.3d 1180, 1186 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994); *Gilbert v. Frank,* 949 F.2d 637, 640–42 (2d Cir.1991). Congress intended relevant case law developed under the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., to be generally applicable to analogous inquiries under the ADA. *See White v. York,* 45 F.3d 357, 360, n. 5; *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994) ((Rehabilitation Act case law defining "disability" applicable to similar inquiry under ADA). Also useful in ADA actions are the regulations the Equal Employment Opportunity Commission (EEOC) issued to implement Title 1 of the ADA, 29 C.F.R. P. 1630. *See* 42 U.S.C. § 12116.

■■■ Here, there is no dispute that Hogue was disabled within the meaning of the ADA or that MQS removed him from the supervisor position because of his disability. Rather, MQS disputes Hogue's claim that with reasonable accommodation, he could have performed the supervisor job. This claim may be tested through the application of traditional burdens of proof as outlined in *White v. York,* 45 F.3d 357, 360, "Once the plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate." *Id.* at 361 *citing Mason,* 32 F.3d at 318; *Barth,* 2 F.3d at 1187; *Gilbert,* 949 F.2d at 642. *See also Barth v. Gelb,* 2 F.3d 1180, 1185–87 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994). If the employer presents such evidence, the plaintiff may not simply rest on his pleadings. He has the burden of coming forward with rebuttal evidence concerning his individual capabilities along with suggestions for possible accommodations. *Mason,* 32 F.3d at 318; *Chiari v. City of League City,* 920 F.2d 311, 318 (5th Cir.1991). "As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability." *White v. York,* 45 F.3d 357, 361, *citing St. Mary's Honor Center v. Hicks,* —— U.S. ——, —— —— ——, 113 S.Ct. 2742, 2747–49, 125 L.Ed.2d 407 (1993); *Tyndall,* 31 F.3d at 213; *Barth,* 2 F.3d at 1186; *Pushkin v. Regents of University of Colo.,* 658 F.2d

1372, 1385 (10th Cir.1981). *See also Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir.1994).

## Essential Functions

■ In deciding defendant's motion for summary judgment on Hogue's ADA claim, I must look at the "essential functions" of the supervisor job at MQS. The term "essential functions" is defined by the EEOC regulations as "the fundamental job duties of the employment position the individual with a disability holds" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Deciding whether specific job duties are essential job functions requires courts to engage in fact-specific inquiries. *Hall v. U.S. Postal Service*, 857 F.2d 1073, 1079 (6th Cir.1988).

■ MQS defines an essential function of the supervisory job as being able to conduct any field inspection as needed (Def.Brief p. 11). In contrast, Hogue characterizes the essential function of the supervisory job as "ensur[ing] that inspections are done accurately and timely" (Pltf.Brief p. 17). In support of his view of this supervisory essential function, Hogue points to the supervisor job analysis signed by Dennis McMullin. This document states the supervisor "performs inspections as needed. (40% of time doing inspection.)" (Pltf.Exh. 1 p. 300045). Also, McMullin testified that the supervisor was responsible for allocating work among the inspectors (McMullin Depo. p. 57). Under these circumstances, a factfinder could disagree about what the essential function(s) of the supervisory position entailed and, consequently, whether Hogue was "otherwise qualified." Thus, there are genuine issues of material fact as to what the essential functions of the MQS supervisory position entailed.

## Reasonable Accommodation

However, Hogue has, in essence, admitted that he would have been unable to perform the "essential functions" as described by he or MQS without accommodation. Therefore, I must also determine whether Hogue has demonstrated a genuine issue of fact regarding his ability to perform the essential func-

tion(s) with "reasonable accommodation." *White v. York*, 45 F.3d 357, 362.

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The ADA does not define "reasonable accommodation." However, the term may include:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B).

Also, EEOC regulations define the term "reasonable accommodation" to mean, *inter alia:*

> [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.

29 C.F.R. § 1630.2(o)(ii).

"Undue hardship" is defined as "an action requiring significant difficulty or expense, when considered in light of [certain] factors" including:

> (i) the nature and cost of the accommodation needed ...
>
> (ii) the overall financial resources of the facility ... involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the

number of its employees; the number, type, and location of its facilities, and (iv) the type of operation ... of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility ... in question to the covered entity.

42 U.S.C. § 12111(10)(A) and (B).

The determination that a reasonable accommodation is not possible is, like the related essential function determination, highly fact-specific. *Hall v. U.S. Postal Service*, 857 F.2d 1073, 1079 (6th Cir.1988) (reasonable accommodation under Rehabilitation Act). Courts must consider whether any "reasonable accommodation" by the employer would enable the disabled person to perform the essential functions. *Hall v. U.S. Postal Service*, 857 F.2d at 1078 citing *School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17 (1987). It is unreasonable, however, to require an employer to accommodate a disabled person by eliminating one of the essential functions of the job. *See Gilbert v. Frank*, 949 F.2d 637 (2d Cir.1991); *Hall v. U.S. Postal Service*, 857 F.2d at 1078; *Jasany v. U.S. Postal Service*, 755 F.2d 1244, 1250 (6th Cir.1985).

Hogue claims that although disabled, he is qualified to perform the essential functions of the job with reasonable accommodation. He suggests three variations of accommodations to meet his needs: 1) he be allowed to consider his own physical limitations in scheduling jobs; 2) if necessary, a helper be assigned to perform physical tasks beyond his capabilities; or 3) MQS could have another employee conduct the field inspections he is unable to perform while Hogue assumed the co-worker's duties. MQS contends that under the undisputed facts, each of these suggested accommodations is unreasonable. I disagree.

First, MQS states it is unreasonable to provide an aide to accompany Hogue to perform physical tasks that he could not. In support of its position, MQS cites the example of a security guard position requiring inspection of i.d. cards. Certainly an employer would not have to provide an assistant to look at the i.d. cards for a legally blind employee. However, this situation is distinguishable from Hogue's case. The aide to the blind guard would be performing the job for the disabled individual rather than assisting the individual to perform the job.

Next, MQS asserts it was not workable for Hogue to assume the duties of a co-worker while the co-worker did on-site inspections for Hogue. MQS states conclusively that "[n]othing MQS could have done would have enabled Hogue *himself* to conduct field inspections (Def.Brief p. 13) (emphasis in original)." However, there is evidence that after Hogue returned to work as a training instructor, he adequately performed a field inspection job at Explosive Fabricators. Also, MQS contends that Hogue's suggested accommodation would cause undue financial hardship on MQS. In response, Hogue points to evidence that MQS does approximately $30,000,000 to $40,000,000 of gross sales per year and has twenty-five offices nationwide (McMullin Depo. p. 22). Hogue also submits the affidavit of Brett Wilson, a vocational rehabilitation consultant, which opines that reasonable accommodation would have allowed Hogue to function as a supervisor at MQS (Pltf.Exh. 15). Further, Hogue testified from experience that using a helper or assigning jobs based on his physical capabilities would not have significantly changed the office practice (Hogue Depo. p. 112).

Under these circumstances, unlike the plaintiff in *White v. York*, Hogue has raised a legitimate factual dispute as to whether there were reasonable accommodations MQS could have provided for Hogue without undue hardship. Accordingly, I will deny summary judgment on Hogue's ADA claim.

MQS also argues that the supervisor position was not available when Hogue returned to work on September 1, 1992. Apparently MQS argues it filled the position in early July when it offered Hager the slot subject to Hager passing the Level III certifications tests in August (McMullin Depo. p. 169). However, MQS personnel papers dated September 21, 1994 reflect that Hager's promotion was effective September 14, 1992

(Def.Exh. 12). Consequently, there exists a genuine dispute about the material factual issue when the position was filled and whether the supervisor position was available when Hogue returned to work in September, 1992.

## B. Constructive Discharge

MQS also seeks summary judgment on Hogue's claim that he was constructively discharged. I agree summary judgment should enter on behalf of MQS on this claim.

The ADA relies on the enforcement powers, remedies, and procedures set forth in sections 2000e–4, 5, 6, 8, and 9 of Title VII. 42 U.S.C. § 12117(a). Employer discrimination is prohibited "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Title VII is violated when the workplace is permeated with discriminatory behavior sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment. *Harris v. Forklift Systems, Inc.,* — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). The standard is objective concerning whether the environment is one which would be reasonably perceived, and is perceived, as hostile or abusive. *Harris v. Forklift,* — U.S. at —, 114 S.Ct. at 371, *aff'g Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986).

The question on which constructive discharge cases turn is whether the employer, by its illegal discriminatory acts, has fostered a climate in the workplace that would compel a reasonable person in the employee's position to resign. *James v. Sears, Roebuck and Co., Inc.,* 21 F.3d 989, 992 (10th Cir.1994). *See also Acrey v. American Sheep Industry Ass'n,* 981 F.2d 1569, 1573–74 (10th Cir.1992). There is no mathematically precise test of what is intolerable. Rather, whether an environment is "hostile" or "abusive" must be determined by looking at all the circumstances. *Harris v. Forklift,* — U.S. at —, 114 S.Ct. at 371. Such circumstances may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Id.* Unequal pay standing alone does not amount to a constructive discharge. *Id.*

Casual or sporadic racial slurs do not always give rise to a constructive discharge. *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981). Even a combination of some of these factors may not constitute constructive discharge. *Muller v. U.S. Steel Corp.,* 509 F.2d 923 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). Rather, each case must be reviewed on its individual merits. *Irving v. Dubuque,* 689 F.2d 170, 173 (10th Cir.1982). No single factor is required but "cumulative events" can ultimately cause working conditions to deteriorate to an intolerable level. *Id.*

Hogue contends there was a "continued pattern of harassment" based on his training instructor job which reduced his pay, hours, and eliminated his eligibility for health insurance. He also bases his claim on his firing for filing the EEOC claim followed by his reinstatement. MQS contends that there was no climate at MQS which would have compelled a reasonable person to resign.

Here, Hogue elected to return to work as training instructor after MQS refused to bring him back as supervisor and after MQS illegally fired him in January. After returning to work as training instructor, he remained on the job for five months before resigning to take a new job. The timeliness of an employee's resignation is "an important factor in the constructive discharge equation." *Smith v. Bath Iron Works Corp.,* 943 F.2d 164, 167 (1st Cir. 1991). It is significant that Hogue does not allege any acts of discrimination following his return to work as training instructor. Indeed, according to his own testimony Hogue did not look for employment elsewhere during the months following his return to work because "I was being treated fairly where I was" (Hogue Depo. p. 165). During the several months after he returned to work, Ho-

gue took no steps short of resignation to make working conditions more tolerable. He did not advise McMullin he felt he could do more than his assigned duties or ask for more work hours. *See Woodward v. City of Worland,* 977 F.2d 1392, 1401 (10th Cir.1992). Also, after being approached by a competitor with a job offer, Hogue took a week and a half to think about the new offer before deciding to resign from MQS. When he did resign, he started his new job the next working day. Viewing this evidence in the light most favorable to Hogue, I conclude no reasonable trier of fact could find that a reasonable person would perceive the working environment at MQS as intolerable. Accordingly, I will grant summary judgment in favor of MQS on Hogue's constructive discharge claim.

## C. Damages

MQS seeks summary judgment limiting Hogue to actual damages of $624.00. It also seeks summary judgment on the issues of compensatory and punitive damages. I will deny summary judgment on the issues of actual and compensatory damages and will grant MQS' motion for summary judgment on punitive damages.

The provisions of the ADA explicitly provide that the remedies available for its violation are those available under the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5. 42 U.S.C. § 12117(a). *See also* 42 U.S.C. §§ 2000e–5, 2000e–6, 2000e–8, and 2000e–9. Remedies for intentional unlawful employment practices may include reinstatement with back pay, 42 U.S.C. § 2000e–5(g)(1). Also, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, outlines the damages available for cases of intentional discrimination under the ADA. The complaining party may recover compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. . . ." 42 U.S.C. § 1981a(b)(3). Compensatory damages do not include backpay. 42 U.S.C. § 1981a(b)(2). A complaining party may seek punitive damages if the defendant discriminated "with malice or with reckless in-

difference to the federally protected rights of [the plaintiff]." 42 U.S.C. § 1981a(b)(1).

## 1. Actual Damages

MQS does not dispute that McMullin's refusal to allow Hogue to return to work constituted unlawful retaliation for Hogue's filing an EEOC claim of discrimination (Def.Brief p. 16). Rather, MQS seeks to limit the amount Hogue would recover for the unlawful retaliatory act to $624.00 based on Hogue's losing two weeks of work when McMullin illegally fired him for filing his EEOC claim (Def.Brief pp. 16–17). In reaching the $624.00 figure, MQS assumed Hogue was not entitled to return as supervisor and, thus, calculated Hogue's lost wages based on his training instructor pay rate. In part IIIA above, I concluded there is a genuine issue for the jury to determine whether Hogue was entitled to return to work as a supervisor. Thus, if a jury were to decide that Hogue was entitled to return to work as supervisor, Hogue's damages for MQS' retaliatory act would be greater than $624.00. Therefore, I will deny defendant's motion for summary judgment on actual damages.

## 2. Compensatory Damages

MQS also seeks summary judgment on Hogue's claim for compensatory damages for emotional distress based on the short time between MQS' retaliatory firing and rehiring of Hogue. MQS also contends, in essence, as a matter of law Hogue suffered no injury to form the basis for compensatory damages. I will deny summary judgment on these grounds.

The parties dispute the time between Hogue's discharge and reinstatement. MQS believes McMullin fired Hogue on January 4, 1993. It relies on conflicting testimony by Hogue that Hogue was rehired only two days after the termination (Def.Brief p. 8 n. 3). In contrast, Hogue states McMullin terminated him on January 5, 1993, (McMullin Depo. pp. 190–91 and Hogue Depo. p. 134) and rehired him on January 11, 1993 (McMullin Depo. p. 192). Thus, there remains a question of fact about a material element in determining compensatory damages, if any, to be awarded.

MQS also contends Hogue has offered no evidence that he suffered any emotional harm as a result of its retaliatory action in firing him (Def.Brief p. 17). I do not agree. Hogue has testified to the existence, nature and severity of emotional distress he states he suffered from MQS' actions (Hogue Depo. pp. 137–38, 142, 156, 161). The existence of emotional distress and amount of compensatory damages, if any, is a disputed question of fact. Accordingly, I will deny summary judgment on plaintiff's compensatory damages claim.

### 3. Punitive Damages

MQS argues, and I agree, that it is entitled to summary judgment on Hogue's claim for punitive damages.

The Civil Rights Act of 1991 allows recovery of punitive damages if a plaintiff demonstrates the defendant discriminated against him or her "with malice or with reckless indifference to an individual's federally protected rights." 42 U.S.C. § 1981a(b)(1). Neither "malice" nor "reckless indifference" is defined in the ADA or in the Civil Rights Act of 1991. Although while there is no case law dealing with punitive damages under the ADA, I look to federal standards governing the determination of punitive damages under federal civil rights statutes. *Garrick v. City and County of Denver,* 652 F.2d 969, 971 (10th Cir.1981). Sufficiency of evidence to justify an award of punitive damages is a question of law for the court. *Miller v. Cudahy Co.,* 858 F.2d 1449, 1457 (10th Cir.1988). To sustain an award of punitive damages for discrimination in violation of federal civil rights, a plaintiff must prove that the discrimination was "malicious, willful, and in gross disregard of [plaintiff's] rights." *EEOC v. Gaddis,* 733 F.2d 1373, 1380 (10th Cir.1984). Proper considerations in punitive damages cases include "an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent." *Miller v. City of Mission, Kan.,* 705 F.2d 368, 377 (10th Cir.1983) *quoting Busche v. Burkee,* 649 F.2d 509, 520 (7th Cir.1981).

Here, Hogue proffers only McMullin's statement to him that "we can't have this shit," referring to Hogue's EEOC discrimination claim (Hogue Depo. p. 134) (McMullin Depo. p. 191). However, MQS "cured" its discrimination the same day company headquarters was informed of Hogue's discharge. In any event, there is no evidence that any further misconduct occurred.

Under the circumstances of this case, I conclude as a matter of law that this single comment by McMullin is not so egregious or shocking so as to allow assessment of punitive damages. Not every intentional violation of a plaintiff's constitutional rights subjects a defendant to punitive damages. *Wulf v. City of Wichita,* 883 F.2d 842, 867 (10th Cir.1989). Therefore, I will grant defendant's motion for summary judgment on punitive damages.

Accordingly, it is ORDERED that:

1. defendant's motion for summary judgment on plaintiff's claim for relief based on the Americans with Disabilities Act, 42 U.S.C. § 12111 et seq. is DENIED;

2. defendant's motion for summary judgment on plaintiff's claim for relief based on constructive discharge is GRANTED;

3. defendant's motion for summary judgment on plaintiff's claim for actual and compensatory damages is DENIED;

4. defendant's motion for summary judgment on plaintiff's claim for punitive damages is GRANTED.