**Patrick WARD, Complainant, Petitioner–Appellee,**

v.

**DEPARTMENT OF NATURAL RESOURCES, Respondent–Appellant,**

and

**State Personnel Board, Appellee.**

No. 06CA2496.

Colorado Court of Appeals, Div. II.

April 17, 2008.

Certiorari Dismissed June 23, 2008.

Patricia Cookson, P.C., Patricia L. Cookson, Grand Junction, Colorado, for Petitioner–Appellee.

John W. Suthers, Attorney General, Christopher J. Puckett, Assistant Attorney General, Denver, Colorado, for Respondent–Appellant.

Roxane D. Baca, Assistant Attorney General, Denver, Colorado, for Appellee.

Opinion by Judge FURMAN.

Respondent, the Department of Natural Resources (DNR), seeks review of an order of the Colorado State Personnel Board (Board). The Board upheld the decision of an administrative law judge (ALJ) to reinstate the employment of Patrick Ward and to award him back pay, front pay, and attorney fees, after it determined the DNR violated Colorado's Anti–Discrimination Act (CADA), section 24–34–402, C.R.S.2007, and the Americans with Disabilities Act (ADA), 42 U.S.C. sections 12101–12117 (1994). We affirm.

## I. Background

The ALJ's findings, and facts the parties stipulated to, reveal the following. From 1992 until 2004, Ward worked for the DNR as a Wildlife Technician III at the Rifle Falls Fish Hatchery. Each year the hatchery raises approximately five million trout for release into the lakes and rivers of Colorado. It has three large buildings that house the fish. The "hatchery building" houses the smallest fish; the "nurse basins" house fish at the next stage of development; and the "raceways" house the biggest fish, prior to their being shipped throughout the state.

A number of Ward's tasks were physically demanding. Ward was responsible for cleaning the fish basins, feeding the fish, and moving them between basins. To feed the fish, he loaded fifty-pound bags of food into a blower truck. He also was responsible for inspecting and operating vehicles and equipment on the hatchery grounds, including snow plows, dump trucks, forklifts, hydraulic cranes, and tractors.

In August 2001, Ward injured his back while working. He was placed on temporary work restrictions that his supervisor sometimes ignored. Ward periodically re-injured himself, due in part to his supervisor's requirement that he work beyond his restrictions.

Ward sent a letter to the DNR's Human Resources (HR) Department. The letter stated in part, "Because of an on-the-job injury, which resulted in a permanent, partial disability; I am requesting reassignment to a position that is less physically demanding." The letter was received by Melinda Elswick, the DNR's ADA coordinator and risk manager.

In response, Elswick sent Ward a letter, stating in pertinent part:

> Thank you for your letter requesting job reassignment. We are willing to search for other positions on your behalf, as described in our published policy on Return to Work/Modified Duty (copy enclosed). That policy describes how we will compare the physical requirements of any vacant positions we have available, to the permanent restrictions placed on you by your doctor.

The letter also informed Ward that the DNR could not begin the job search until Ward had submitted a "Fitness–to–Return" form, documenting his permanent restrictions.

The Return to Work/Modified Duty Policy from the DNR Safety Handbook states in pertinent part:

If the employee can no longer perform the essential functions of the job, even with a reasonable accommodation, the employee *may* be protected by the Americans with Disabilities Act (ADA). All decisions should be discussed with and coordinated by the DNR Human Resources Office and the DNR ADA Coordinator.

The Human Resources Office will make a search for vacant positions within the [DNR], for which the employee is qualified, and which do not exceed the employee's permanent restrictions. These positions may be at the same or a lower grade level as the employee's previous job. (Promotions will not be offered as an accommodation—the employee may, however, compete for promotions.) The employee will be offered an opportunity to transfer/demote to any available positions found.

Ward arranged a functional capacity evaluation, which took several months to schedule. During those months, as found by the ALJ, "[Ward's supervisor] stated to Mr. Ward that if he couldn't handle the job, he would have to move on down the road and get out of there, or words to that effect."

After Ward completed the functional capacity evaluation, Ward's physician issued a "Fitness to Return Certification," listing a number of restrictions. His physician placed him at maximum medical improvement, with a twenty-two percent permanent partial impairment rating, for purposes of workers' compensation.

In September 2003, Ward submitted the certification to the DNR and reiterated his request for either reassignment to a vacant position or restructuring of his current position. The following month, Ward's physician completed a second list of restrictions, which Ward also submitted to the DNR.

Elswick and Ward's supervisor determined that Ward could not perform the essential functions of the Wildlife Technician III position, with or without reasonable accommodations, and decided not to restructure his job.

The DNR has approximately 1500 certified employees, but did not consider Ward as a candidate for any vacant positions at the DNR for which he may have been qualified during the five months leading up to his termination from employment. Ward had a degree in biology, and was qualified to perform office work and administrative duties.

Ward did not work after October 1, 2003, but received available leave, including leave under the Family Medical Leave Act and short-term and long-term disability benefits. His leave was exhausted on March 29, 2004.

Elswick wrote a pretermination letter, dated March 16, 2004, which was signed by the Chief of Fish Hatcheries, and stated in pertinent part:

Procedure P–5–10 [Board Rule 5–10, 4 Code Colo. Regs. 801 (2007)] provides that when an employee has expended all paid leave and is unable to return to work and family/medical leave and/or short-term disability leave is inapplicable, the appointing authority may administratively separate the employee.

However, Rule 5–10 also states in a relevant part that was not quoted:

No employee may be administratively separated if [family medical leave] or short-term disability leave ... apply or if the employee is a qualified individual with a disability who can reasonably be accommodated without undue hardship.

Rule 5–10 and the DNR's Modified Duty/Return to Work Policy required Elswick to inform Ward of his rights under the ADA. However, she did not do so, and no one at the DNR determined whether he was disabled or was entitled to ADA protections.

Ward wrote another letter in response to the pretermination letter, stating he had made three requests for accommodations, including relocation, and there had "not been even the slightest effort to accommodate my physical limitations or reassign me to a job that I can handle." The DNR did not respond to this letter.

The DNR conducted a job search one week before officially terminating Ward. In conducting the search, the DNR (1) failed to list Ward's computer and administrative experi-

ence and skills under "Qualifications"; (2) found ten vacant positions; (3) did not provide any information to Ward about these ten vacant positions; and (4) unilaterally determined Ward was not qualified for any of the vacant positions, given his physical restrictions.

On March 29, 2004, the DNR terminated Ward's employment, stating in pertinent part:

You have requested work accommodation for your disability. In accordance with our Modified Duty/Return to Work Policy, we first determined that your present position cannot be modified to meet your restrictions, without removing essential functions. We next made a search for vacant positions at or below your current level, with physical requirements within your restrictions, for which you are qualified. We used the most recent restrictions provided by your doctor in September 2003, and based the assessment of your qualifications on your most recent application, from February 2004, and were unable to identify any positions for which you are qualified, which fall within your physical restrictions.

On April 2, 2004, Ward timely filed an appeal with the Board, claiming disability discrimination. After a four-day evidentiary hearing, the ALJ issued an initial detailed and well-reasoned decision in Ward's favor. The ALJ found that (1) Ward was disabled because he was permanently restricted in the manner and duration of performing manual tasks, including lifting, pushing, and reaching above his shoulders; (2) he could not perform the essential functions of a Wildlife Technician III; and (3) according to ADA standards, the DNR did not reasonably accommodate Ward's disability by engaging in an interactive process with him, including conducting a timely vacant job search. The ALJ concluded that Ward was terminated on the basis of disability, in violation of the CADA and the ADA.

The Board reviewed this initial decision and remanded the case to the ALJ "solely for legal analysis regarding the fifth prong of the test for a *prima facie* case of discrimination based on a disability, as enunciated in *Com-*

*munity Hospital v. Fail,* 969 P.2d 667 (Colo. 1998)."

In *Fail,* the supreme court adopted a test to be applied when an employee seeks to establish a violation of the ADA:

[W]e adopt the following test for when an employee seeks to establish that her employer violated the ADA by failing to offer reasonable accommodation. As part of her prima facie case, the employee must show: (1) that she is a disabled person within the meaning of the ADA; (2) that she was otherwise qualified for her current position; (3) that she was terminated from that position because of her disability; (4) that she requested reasonable accommodation either within her current position or through transfer to a vacant position for which she was qualified; and (5) that, despite her request for reasonable accommodation by transfer to a vacant position, the employer continued to seek applicants for the vacant position or hired persons who possessed the disabled employee's qualifications. Once this showing has been made, the burden shifts to the employer to prove either undue hardship or that it made an offer of reasonable accommodation.

*Fail,* 969 P.2d at 672.

After briefing by the parties, but without additional evidence, the ALJ issued an Initial Decision on Remand, affirming the previous findings and analyzing the *Fail* case. The ALJ found:

The evidence is undisputed that despite Complainant's request for transfer to a vacant position, Respondent, in violation of its own policy, failed to consider Complainant as a candidate for any and all vacant positions in the 1500–employee statewide agency, for a period of over five months. These facts meet the fifth prong of the [prima facie case] in *Fail. Respondent is equitably estopped by its own policy* from asserting that Complainant must produce evidence of specific vacant jobs, and Complainant is entitled to a judgment he has established the fifth element of the prima facie case in *Fail.*

(Emphasis added.) Once again, the ALJ concluded the DNR discriminated against

Ward based on disability, and issued an order that (1) reinstated Ward with full back pay and benefits to the date of his termination from employment; (2) ordered the DNR and Ward to engage in an interactive process for a period of up to six months, during which time Ward was to receive front pay, consisting of his full pay and benefits; and (3) after finding the DNR had engaged in bad faith conduct, awarded Ward reasonable attorney fees and costs.

The Board adopted the ALJ's findings and affirmed the order.

The DNR seeks review of the Board's decision.

## II. Standard of Review

We may reverse the decision of an administrative agency if we conclude "the agency acted arbitrarily or capriciously, made a decision that is unsupported by the record, erroneously interpreted the law, or exceeded its authority." *Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1247 (Colo.2001); *see* § 24–4–106(7), C.R.S.2007. All reasonable doubts as to the correctness of the administrative body's ruling must be resolved in its favor, and the administrative determination will not be disturbed absent an abuse of discretion. *Lawley,* 36 P.3d at 1252.

The DNR contends the Board erroneously interpreted the law, and made a decision that is unsupported by the record, because (1) Ward did not timely appeal or grieve its decision to delay conducting a vacant job search; (2) the CADA does not require it to conduct a vacant job search; and (3) Ward did not prove a prima facie case of discrimination as required by *Fail.* The DNR also contends the Board erred in reinstating Ward with back pay and front pay, and in awarding him attorney fees and costs. We disagree, and affirm the Board's decision.

## III. Appeal or Grieve

Initially, the DNR contends that, because Ward did not timely appeal or grieve the DNR's decision to delay conducting a job search, the Board did not have jurisdiction to review this issue. We disagree.

### A. Appeal

Section 24–50–125.3, C.R.S.2007, governs appeals of discriminatory or unfair employment practices in the state personnel system. It provides in pertinent part:

> An applicant or employee who alleges discriminatory or unfair employment *practices* ... in the state personnel system may appeal within ten days of the alleged *practice* by filing a complaint in writing with the board or the Colorado civil rights division in the department of regulatory agencies, which shall investigate such complaint on behalf of the board ....

(Emphasis added.)

In construing a statute and determining legislative intent, we rely on the language of the statute and give the words used their plain and ordinary meaning. § 2–4–101, C.R.S.2007; *see also In re Title, Ballot Title & Submission Clause,* 961 P.2d 1077, 1079 (Colo.1998) (when legislative language is unambiguous, court must give effect to the plain and ordinary meaning of the statute); *Aragon v. Dep't of Corr. San Carlos Corr. Facility,* 140 P.3d 278, 280 (Colo.App.2006).

Section 24–50–125.3 is unambiguous; it states an employee who alleges discriminatory or unfair employment "practices" may file an appeal within ten days of the alleged "practice." Hence, in cases involving appeals under section 24–50–125.3, when an employee alleges the employer engaged in actions that constitute more than one discriminatory or unfair employment practice, as happened here, and the actions are closely related to each other, the employee must file the appeal within ten days of the last such practice.

In his complaint, Ward alleged: (1) he suffered an on-the-job injury; (2) he did not recover from that injury; (3) he was required to do heavy, physical work, without any accommodations; (4) he requested transfer or reassignment to a position with lesser physical requirements; and (5) instead of conducting a job search or reassigning him, the DNR terminated his employment. Therefore, Ward's allegations were not based on a single act, but on the DNR's discriminatory practices that continued until Ward was terminated.

Moreover, because the DNR told Ward it would conduct a vacancy search once he submitted the "fitness-to-return" form documenting his permanent restrictions, Ward had no reason to believe the DNR would decide not to conduct that search. Therefore, we conclude any date when the DNR engaged in the discriminatory practice was too difficult to discern for purposes of complying with the ten-day rule under section 24–50–125.3.

Accordingly, we further conclude Ward timely appealed the DNR's decision to delay conducting a job search, and the Board had jurisdiction to review this issue.

### B. Grievance

Board Rule 8–5 provides, "A permanent employee may grieve matters that are not subject to appeal or review by the Board or Director." However, we conclude this rule does not apply here, because the DNR's delay in conducting the job search is subject to review by the Board, and in any event, Ward did not know the DNR had violated its job search policy until he appealed his termination. *See* Board Rule 8–8(A)(1) ("All employees must be informed in writing how to initiate and proceed through the grievance process, including all deadlines.").

### IV. The CADA

The DNR next contends the Board should not have applied the ADA standards, but was limited to assessing Ward's claims under the CADA, which does not require it to reassign a disabled employee to a vacant position. Further, it contends, because the Board found Ward was unable to perform the essential functions of his current job, the DNR did not discriminate against him. Under the circumstances, we disagree.

### A. ADA Standards

Board Rule 9–4 provides that "[s]tandards and guidelines adopted by the Colorado Civil Rights Commission and/or the federal government, as well as Colorado and federal case law, should be referenced in determining if discrimination has occurred." *See also* Colorado Civil Rights Commission (CRC) Rule 60.1(C), 3 Code Colo. Regs. 708–1 (2007).

Section 24–34–402(1), C.R.S.2007, defines discriminatory or unfair employment practices. As relevant here, section 24–34–402(1)(a), C.R.S.2007, provides that it is a discriminatory practice "[f]or an employer .... to discharge .... any *person otherwise qualified* because of disability." (Emphasis added.)

The rules implementing the CADA define a person otherwise qualified as "a person with a disability who, with reasonable accommodation, can perform the essential functions *of the job in question.*" CRC Rule 60.2(B) (emphasis added).

The ADA defines a qualified individual with a disability as "an individual with a disability who ... with or without reasonable accommodation, can perform the essential functions" of "the employment position *such individual holds or desires.*" 29 C.F.R. § 1630.2(m) (emphasis added).

■ However, because the DNR's Return to Work/Modified Duty Policy referenced the ADA standards, and Elswick's letter to Ward stated the DNR would look for other positions on his behalf, as described in that policy, we conclude the ALJ, as affirmed by the Board, did not err in applying the ADA standards, and requiring the DNR to reassign Ward to a vacant position he was qualified to perform. *See Tesmer v. Colo. High Sch. Activities Ass'n,* 140 P.3d 249, 253 (Colo.App.2006)(whenever possible, the CADA should be interpreted consistently with the ADA). We now turn to the question of whether the DNR discriminated against Ward.

### B. The ADA Standards Under *Fail*

The DNR contends, in the alternative, that the Board's findings of fact were unsupported, and Ward did not prove a prima facie case of discrimination required by *Fail,* because (1) the Board improperly shifted the burden of establishing a prima facie case from Ward to the DNR; (2) evidence Ward provided did not establish he was permanently disabled; and (3) the Board's finding of disability discrimination was not supported

by the evidence because Ward did not identify any vacant positions for which he was qualified. We disagree with each contention.

### 1. The Burden of Establishing a Prima Facie Case

The DNR contends the Board improperly shifted the burden of establishing a prima facie case from Ward to the DNR, and in so doing misapplied the fifth prong in *Fail.* We disagree.

In interpreting the fifth prong, the supreme court held:

> [W]e limit the employee's burden of proof on the issue of reasonable accommodation to showing that she either asked for reasonable accommodation in her current position or that she applied and was qualified for a vacant position. In addition, the employee must show that the employer continued to seek or hire applicants for the vacant position from persons who possessed the disabled employee's qualifications.

*Fail,* 969 P.2d at 674.

The ALJ considered the DNR's argument that Ward must show that it continued to seek or hire applicants, but had not produced evidence at the hearing concerning specific vacant jobs for which he was qualified. However, the ALJ found:

> Respondent's argument overlooks its own Return to Work policy ... which placed the legal burden squarely on Respondent's Human Resources Office to "make a search for vacant positions within the [DNR], for which the employee is qualified, and which do not exceed the employee's permanent restrictions." Moreover, Respondent's HR Director promised Complainant in a May 13, 2004 letter that it would conduct the search pursuant to that policy.

The ALJ found the DNR was equitably estopped by its own policy from asserting that Ward must produce evidence of specific vacant jobs.

 "The doctrine of equitable estoppel is premised upon principles of fair dealing and is designed to prevent manifest injustice." *Comm. for Better Health Care for All*

*Colo. Citizens v. Meyer,* 830 P.2d 884, 891 (Colo.1992). It is a defensive doctrine that may be invoked to bar a party from raising a defense or objection it otherwise would have had. *Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XXII, L.L.C.,* 176 P.3d 737, 741 (Colo.2007).

 "The following elements must be established to support a claim of equitable estoppel: the party to be estopped must know the facts and either intend the conduct to be acted on or so act that the party asserting estoppel must be ignorant of the true facts, and the party asserting estoppel must rely on the other party's conduct with resultant injury." *Comm. for Better Health Care,* 830 P.2d at 891–92; *see Dep't of Health v. Donahue,* 690 P.2d 243, 247 (Colo.1984); *Piz v. Hous. Auth.,* 132 Colo. 457, 463, 289 P.2d 905, 908–09 (1955).

 Whether the circumstances of a particular case involve representation and reasonable reliance giving rise to equitable estoppel is a question of fact. Findings of fact must be accepted on review, unless they are so clearly erroneous as not to find support in the record. *Black v. Sw. Water Conservation Dist.,* 74 P.3d 462, 468 (Colo. App.2003).

 Because Elswick committed to search for a vacant position in a letter to Ward, and did not consider all of Ward's qualifications for the few vacant positions she found, we conclude the record supports the ALJ's finding, as adopted by the Board, that the DNR is equitably estopped from arguing that Ward had the burden to show it continued to seek or hire applicants for any position he could have performed. *See Wheat Ridge Urban Renewal,* 176 P.3d at 741–42; *Lucero v. Goldberger,* 804 P.2d 206, 209 (Colo.App.1990).

Moreover, the circumstances here are different from those in *Fail.* In *Fail,* the employee had access to specific information about vacant positions, including qualifications, applications, and hirings for those positions. *Fail,* 969 P.2d at 673–74. In contrast, the record here establishes that Ward relied on the DNR's assurance that it would con-

duct a vacant job search. Thus, he did not obtain access to information about whether the DNR had vacant jobs, whether the DNR had sought applicants for such vacant positions, or whether the DNR had hired persons with Ward's qualifications for those vacant positions.

Accordingly, we conclude the Board did not improperly shift the burden of establishing a prima facie case from Ward to the DNR.

### 2. Permanently Disabled

The DNR next contends the evidence Ward provided did not establish he was permanently disabled. We disagree.

Disability under the CADA means "a physical impairment which substantially limits one or more of a person's major life activities and includes a record of such an impairment and being regarded as having such an impairment." Section 24–34–301(2.5)(a), C.R.S. 2007. "Substantially limits" means either "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i)-(ii). "Major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

The ALJ reviewed the Fitness–to–Return form provided by Ward and found he had a physical impairment that limited one or more of his major life activities; that he was permanently restricted in the manner and duration of performing manual tasks; and that those tasks included lifting, pushing, pulling, and reaching above his shoulders.

Where the appellant challenges an ultimate conclusion of fact, we must determine whether there is substantial evidence in the record as a whole to support that conclusion. *Koinis v. Colo. Dep't of Pub. Safety*, 97 P.3d 193, 195 (Colo.App.2003). Substantial evidence is probative evidence that would warrant a reasonable belief in the existence of facts supporting a particular finding, without regard to the existence of contradictory testimony. *Monfort, Inc. v. Rangel*, 867 P.2d 122, 125 (Colo.App.1993). When applying the substantial evidence test, we must defer to the ALJ's findings, even when two equally plausible inferences may be drawn from the evidence. *Pacesetter Corp. v. Collett*, 33 P.3d 1230, 1234 (Colo.App.2001).

We conclude substantial evidence supports the ALJ's findings and ultimate conclusion that Ward was permanently disabled because (1) the DNR agreed in the "Facts Proven at Hearing" section of its Proposed Findings of Fact and Closing Argument, that Ward's restrictions were "permanent"; (2) although the Fitness–to–Return form that the DNR provided does not refer specifically to permanent restrictions, the form accompanied a letter instructing Ward to use it "to aid you in documenting permanent restrictions"; (3) Ward submitted that form to document his permanent restrictions; and (4) that form listed a number of restrictions, including "no pushing or pulling objects," "no sitting for more than one and one-half hours each day," and "no reaching above the head or shoulders."

### 3. Evidentiary Support

Employers subject to the ADA "shall make reasonable accommodation to the known physical limitations of an otherwise qualified disabled applicant or employee unless the [employer] can demonstrate the accommodation would pose an undue hardship or that it would require any additional expense that would not otherwise be incurred." CRC Rule 60.2(C)(1). To determine the appropriate reasonable accommodation, "it may be necessary for the [employer] to initiate an informal, interactive process" that requires participation by both parties. 29 C.F.R. § 1630.2(o)(3); *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir.1998). The interactive process begins with the employee providing enough information about his limitations and desires to suggest the possibility that reasonable accommodation may be found in a reassignment job. *Smith v. Midland*

*Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999). To trigger the interactive process, no magic words are necessary. But the employee must convey to the employer a desire to remain with the employer despite his or her disability and limitations. *Id.*

 The ALJ found that Ward repeatedly triggered the interactive process, and the DNR violated its duty to reasonably accommodate his disability because it failed to engage him in that process, and failed to timely conduct a vacant job search. We conclude substantial record evidence supports the ALJ's findings, including the letters, the actions of the ADA coordinator, and the state regulations and procedures.

Board Rule 9–5(A) states:

Each department will notify applicants and employees of the name, business address, and telephone number of the ADA coordinator. Appointing authorities and employees should consult with their departmental ADA coordinator concerning what constitutes a disability, reasonable accommodation, and undue hardship.

In September 2003 and March 2004, the DNR's ADA coordinator received Ward's letters alleging discrimination. She was required to investigate allegations of discrimination. *See* Board Rule 8–32. However, at the hearing before the ALJ, she admitted that investigation never occurred. She also admitted that, although Ward "may have" qualified for ADA protections, she did not inform Ward of his rights under the ADA, and no one at the DNR determined whether he was disabled or was entitled to ADA protections.

The pretermination letter sent to Ward omitted the relevant portion of Board Rule 5–10 that states no employee may be administratively separated if he or she is a "qualified individual with a disability who can be reasonably accommodated without undue hardship."

The Modified Duty/Return to Work Policy requires that once work restrictions are in place, the ADA coordinator and Human Resources Office "will make a search for vacant positions within the [DNR], for which the employee is qualified, and which do not exceed the employee's permanent restrictions." Under this policy, "if no positions are found ... [t]he employee may apply for Short Term Disability and Long Term Disability." Although the DNR conducted one vacant job search for Ward, it did so only a week before officially terminating him and did not involve him in that search, and Ward already had used up his disability benefits at the time of the search.

Ward's testimony also supports the ALJ's finding that the DNR did not reasonably accommodate his disability. Ward testified that after he injured his back, the DNR made him climb in and out of the raceways and drag a hose to clean them, lift boards above his head, lift fish food bags, drive the equipment, and move the fish, exceeding his restrictions. He stated this caused him to re-injure his back and take additional days off from work.

Ward also testified that when he handed the doctor's report to his supervisor, indicating work restrictions, his supervisor did not look at the form, but put it in a filing cabinet, locked it up, and told him to do his job. Ward further testified that one day after he discussed his restrictions with his supervisor, the supervisor told him the following: "I'm going to tell you something, if you can't do your [expletive omitted] job, [then] take your crippled old geriatric [expletive omitted] and go down [the] [expletive omitted] road."

Under these circumstances, we conclude substantial evidence supports the Board's conclusion the DNR discriminated against Ward on the basis of his disability. *See Koinis*, 97 P.3d at 195.

## V. Remedies

The DNR last contends the Board erred in reinstating Ward with back pay and front pay, and in awarding him attorney fees and costs. We disagree.

### A. Remedies Available to the Board

Board Rule 9–6 identifies the remedies available to the Board if it finds that discrimination has occurred. It provides in pertinent part:

If the Board finds that discrimination has occurred, it may order: cease and desist orders; hiring, reinstatement, or upgrading of employees, with or without back pay and compensation; referral of applicants for employment; admission or continuation of enrollment in on-the-job training; posting of notices and issuing orders as to the manner of compliance and corrective and/or disciplinary actions, as required; and, altering terms and conditions of employment as appropriate.

 The proper relief to be awarded for wrongful termination is a question of ultimate fact. *Beardsley v. Colo. State Univ.*, 746 P.2d 1350, 1352 (Colo.App.1987). "Where a legal injury is of an economic character, as here, legal redress in the form of compensation should be equal to the injury." *Donahue*, 690 P.2d at 250.

### B. Back Pay

Relying on *Beardsley*, the DNR contends the award of reinstatement with back pay and benefits to the date of Ward's termination from employment amounted to a windfall because he was not able to work during that time. We disagree.

In *Beardsley*, the university terminated the complainant because he was unable to return to work for the campus police department due to stress-related physical problems. The hearing officer concluded that the termination was improper because the complainant's sick leave had not been exhausted. The officer ordered reinstatement and back pay from the date of termination. *See Renteria v. Dep't of Labor & Employment*, 907 P.2d 619, 622 (Colo.App.1994).

On appeal, the Board reversed, reasoning that such an award was improper because the complainant was physically unable to return to work. The division in *Beardsley* affirmed on the basis that the proper relief to be awarded was a question of ultimate fact for the Board and that it was authorized to modify the hearing officer's decision pursuant to § 24–4–105(15)(b), C.R.S.2007. *See Renteria*, 907 P.2d at 622.

 In this case, the issue was not merely one of wrongful termination, as in *Beards-*

*ley*, but of wrongfully refusing to perform a vacant job search during a period of six months. If Ward had been transferred to another job as he requested, he would not have needed to use all his leave.

Moreover, unlike in *Beardsley*, the ALJ found with record support, and the Board agreed, that the DNR contributed to Ward's disability. Specifically, the ALJ found:

[Ward's supervisor] informed Mr. Ward that there were ways to get around restrictions. He periodically assigned Mr. Ward to perform tasks that exceeded his work restrictions. When this occurred, Mr. Ward would often perform the duties anyway, for fear of losing his job. At other times, Mr. Ward reminded [his supervisor] of his restrictions, and [the supervisor] would give Mr. Ward a different, less physically demanding task to perform. [The back-up supervisor] did not review any of Mr. Ward's work restrictions. If she was responsible for assigning work to the Hatchery crew, she asked Mr. Ward if he could perform a duty within his restrictions, and expected him to inform her whether he could [do so]. . . . [Ward] periodically re-injured himself and had to stop reporting to work. This was due in part to his working beyond his restrictions. On two separate occasions, he lifted heavy objects over his head, causing injury.

Under these circumstances, we conclude the Board properly awarded back pay. Otherwise, Ward would not receive adequate economic redress for the legal wrong committed. *See Donahue*, 690 P.2d at 250 (the economic remedy awarded by the Board should equal, to the extent practicable, the wrong actually sustained).

### C. Front Pay

The DNR contends the Board lacked jurisdiction to order front pay as a remedy until a vacant job was located, because the Board erred in finding disability discrimination. However, we already have determined the Board did not err in finding disability discrimination.

Moreover, in cases of discrimination, section 24–34–405, C.R.S.2007, expands the rem-

edies otherwise available to the Board. *Compare* § 24–50–103(6), C.R.S.2007 ("[a]n action of the state personnel director or an appointing authority which is appealable to the board ... may be reversed or modified on appeal to the board"), *with* § 24–34–405 (authorizing various forms of relief) *and City of Colo. Springs v. Conners*, 993 P.2d 1167, 1175 (Colo.2000) (section 24–34–405 provides equitable remedies to make the employee whole, i.e., to place the employee in the position he or she would have been in but for the discriminatory conduct); *see also* Board Rule 9–6.

■ Front pay is awarded to compensate for lost future wages and benefits, and is used where reinstatement is not feasible. *Equal Employment Opportunity Comm'n v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 732 (5th Cir.2007)(applying front pay to ADA case)(citing *Rutherford v. Harris County*, 197 F.3d 173, 188 (5th Cir.1999), which applied front pay to Title VII case); *see also Black v. Waterman*, 83 P.3d 1130, 1133 (Colo. App.2003).

■ Placing Ward on leave without pay while the DNR finally carried out a vacancy search, which both DNR's policy and Elswick personally had previously committed DNR to perform, would not have redressed Ward's injury. Also, reinstating him was not possible until a job was found. Therefore, we defer to the Board's finding of ultimate fact on the proper relief to be awarded, and conclude the Board did not lack jurisdiction to order front pay until a vacant job was located. *Beardsley*, 746 P.2d at 1352.

## D. Attorney Fees and Costs

The DNR also contends the Board's finding that the DNR engaged in bad faith conduct was unsupported by the evidence, and hence, an award of attorney fees and costs was unjustified. We disagree.

■ The applicable standard of review requires us to affirm the Board's award of attorney fees for bad faith conduct if it is supported by the evidence and has a reasonable basis in the law. *Renteria*, 907 P.2d at 623.

■ Attorney fees and other costs may be awarded against a department taking a personnel action "if it is found that the personnel action from which the proceeding arose or the appeal of such action was instituted frivolously, in bad faith, maliciously, or as a means of harassment or was otherwise groundless." § 24–50–125.5(1), C.R.S.2007. "Bad faith" includes conduct that is arbitrary, vexatious, abusive, or stubbornly litigious. *Halverstadt v. Dep't of Corr.*, 911 P.2d 654, 660 (Colo.App.1995).

The ALJ found the DNR engaged in a pattern of bad faith in this case:

It started with Ms. Elswick concealing her role as ADA Coordinator for DNR from Mr. Ward. It continued through her failure to advise Mr. Ward of his rights and the agency's responsibilities under the ADA, and her continuing failure to engage in the interactive process or to conduct a vacant job search as required under DNR policy. It culminated in Ms. Elswick's pre-termination letter to Complainant, in which she omitted the relevant portion of the rule setting forth the applicable ADA standards that directly applied to this situation. Rarely does an agency representative engage in such intentional misleading of an employee.

■ We conclude the evidentiary findings of the ALJ, affirmed by the Board, that form the basis for the conclusion the DNR acted in bad faith, are supported by the evidence. The DNR argues that it was reasonable for Elswick to rely on a form letter that was provided to her. However, the scope of Elswick's actions considerably exceeded sending that form letter to Ward, and the ALJ's findings are not merely that she alone acted in bad faith, but also that the DNR acted in bad faith, and this prejudiced Ward. For example, before Ward was terminated, the DNR required him to work in excess of his work restrictions, causing him to re-injure himself, and his supervisor told Ward that he would not tolerate him working anywhere but his current job, or words to that effect.

Accordingly, we conclude the ALJ's evidentiary findings were supported by the evidence, and an award of attorney fees and

costs was justified. *See Renteria,* 907 P.2d at 623.

## VI. Attorney Fees and Costs on Appeal

Finally, Ward requests his attorney fees and costs incurred in connection with this appeal. Pursuant to C.A.R. 39.5, if attorney fees are otherwise recoverable for a particular appeal, the party claiming them must specifically request them, and state the legal basis therefor, in the party's principal brief to the appellate court. Because Ward has not stated a legal basis for his request, his request is denied. *See Allen v. Reed,* 155 P.3d 443, 446 (Colo.App.2006). As to costs, Ward may apply by separate motion.

The order is affirmed.

Judge VOGT and Judge DAILEY concur.