COLORADO COURT OF APPEALS
 2016 COA 37
 
 

Court of Appeals No. 14CA2383
State Personnel Board Case No. 2012B 128

Department of Human Services, Colorado Mental Health Institute at Pueblo,
Petitioner-Appellant,
v.
State Personnel Board and Joanne Brown,
Respondents-Appellees.

ORDERS AFFIRMED
Division I
Opinion by JUDGE FOX
Taubman and Miller, JJ., concur
Announced March 10, 2016

Cynthia H. Coffman, Attorney General, Heather J. Smith, Assistant Attorney General, Denver, Colorado, for Petitioner
State Personnel Board, Pro Se 
Schwane Law, LLC, Mark A. Schwane, Denver, Colorado, for Respondent Joanne Brown
 
 
¶1       Petitioner-appellant Department of Human Services, Colorado Mental Health Institute at Pueblo (DHS), appeals from two State Personnel Board (Board) orders, which collectively affirmed the findings of fact of the Administrative Law Judge (ALJ) but reversed two conclusions of law. DHS challenges the Board’s conclusions that (1) DHS’s decision to administratively separate respondent-appellee Joanne Brown from her employment was arbitrary, capricious, or contrary to law; and (2) Brown’s Public Employees’ Retirement Association (PERA) benefits should not be offset from her back pay award. We reject both challenges and affirm.
I. Background
¶2       Since 2010, Brown has served as an admissions psychiatric liaison on the graveyard shift at the Colorado Mental Health Institute at Pueblo (CMHIP). CMHIP is a state psychiatric hospital that serves mentally ill patients, including adolescents and adults.
¶3       According to the position description questionnaire (PDQ) for Brown’s position, the admissions work unit "exists to process all inpatient, outpatient, clinic, dental, and medical surgical admissions into CMHIP." Admissions liaisons are the first line of contact with patients; they screen incoming referrals to determine if admissions criteria are met, assess patient placement in the hospital, and ensure that all legal, medical, and mental health forms are completed. They also record, code, and report patient data, as well as provide feedback about the admissions process to other CMHIP staff. Brown’s PDQ dedicated ninety percent of her time to these tasks.
¶4       In addition, Brown’s PDQ dedicated ten percent of her time to providing "clinical direct patient intervention, i.e. admission interview, behavioral management of a patient supported by CTI [continuum of therapeutic intervention], Verbal Judo, CPR [cardiopulmonary resuscitation], and other mandatory training as identified by [CMHIP’s] Administration." CTI is a method for responding to situations where a patient’s behavior has escalated, verbal interventions have failed, the behavior of the patient presents an imminent threat to himself or others, and the patient needs to be contained or restrained physically. Although Brown was required to undergo mandatory CTI and CPR training, she has not had to use CTI or CPR during her tenure as an admissions liaison.
¶5       In June 2011, Brown began to experience health problems related to a prior work-related injury sustained at CMHIP that caused damage to her neck and lower back.[1] Her treating physician assigned Brown work restrictions, which included not participating in the physical intervention techniques of CTI and CPR. As a result, Brown’s supervisors placed her on modified duty — a temporary reassignment of job tasks — which consisted of not being required to use, or be trained to use, CTI and CPR. In January 2012, Brown’s treating physician assigned her the additional work restrictions of no lifting, carrying, pushing, or pulling more than ten pounds and no bending, twisting, or turning.
¶6       Brown’s modified duty ended on February 29, 2012, and, after exhausting the leave allowed under the Family Medical Leave Act, Brown applied for short-term disability benefits. She was denied. Brown then submitted to DHS a request for a reasonable accommodation under the Americans with Disabilities Act (ADA). As pertinent here, Brown sought an exemption from CMHIP’s requirement that she be prepared to use, and train in, CTI and CPR. After discussing the request with Brown’s supervisors, DHS’s ADA coordinator informed Brown that meeting her request was not possible because CTI and CPR were essential functions of her position and no reasonable accommodation could be found.
¶7       In June 2012, DHS informed Brown that she had exhausted all available paid and unpaid leave and was therefore administratively discharged from her employment.
¶8       Brown timely sought review of her administrative separation, and the parties proceeded to a two-day evidentiary hearing before an AUJ. Brown asserted that DHS discharged her in violation of the Colorado Anti-Discrimination Act (CADA) and ADA prohibitions against disability discrimination. The AUJ’s initial decision affirmed DHS’s decision to administratively separate Brown from her position, concluding that it was not arbitrary, capricious, or contrary to rule or law. The AUJ heavily relied on DHS’s conclusory statements that CTI and CPR were essential functions of Brown’s position and concluded that Brown had "not met her burden of proving" otherwise.
¶9       Brown timely appealed the AUJ’s initial decision to the Board. The Board adopted the AUJ’s findings of fact, but reversed the legal conclusion that DHS’s action was not arbitrary, capricious, or contrary to rule or law. The Board instead concluded, in part, that CTI and CPR were not essential functions of Brown’s position and ordered that Brown be reinstated to her position and awarded back pay and benefits. The Board then remanded the case to the AUJ to determine the amount of back pay and benefits to be awarded.
¶10       On remand, after an evidentiary hearing, the AUJ awarded Brown back pay and benefits from the date of her separation to the date of the Board’s reversal. The AUJ also concluded that Brown’s "PERA disability retirement and unemployment benefits, in addition to her income, must be offset from back pay and benefits."[2]
¶11       Brown and DHS appealed the AUJ’s order on remand to the Board. After briefing, the Board issued a final agency order adopting the AUJ’s findings of fact and the AUJ’s conclusion regarding the dates of Brown’s entitlement to back pay and benefits. The Board, however, reversed the AUJ’s second legal conclusion to the extent that it required an offset to the award for Brown’s PERA disability retirement benefits. The Board concluded that "PERA disability benefits are collateral benefits and cannot count as an offset against [Brown’s] recovery."
II. Standard of Review
¶12       We will reverse the decision of a board of an administrative agency only if we find that the board acted arbitrarily or capriciously, made a decision that is unsupported by the record, erroneously interpreted the law, or exceeded its authority. § 24-4106(7), C.R.S. 2015; Lawley v. Dep’t of Higher Educ., 36 P.3d 1239, 1247 (Colo. 2001); McClellan v. Meyer, 900 P.2d 24, 29 (Colo. 1995).
¶13       We must uphold an agency’s final decision if a consideration of the record as a whole reveals that the decision is supported by substantial evidence. Lee v. State Bd. of Dental Exam’rs, 654 P.2d 839, 843 (Colo. 1982); Partridge v. State, 895 P.2d 1183, 1188 (Colo. App. 1995).
¶14       Moreover, "[a]ll reasonable doubts as to the correctness of the administrative body’s ruling must be resolved in its favor, and the administrative determination will not be disturbed absent an abuse of discretion." Ward v. Dep’t of Nat. Res., 216 P.3d 84, 91 (Colo. App. 2008) (citing Lawley, 36 P.3d at 1252). "Findings of fact must be accepted on review, unless they are so clearly erroneous as not to find support in the record." Ward, 216 P.3d at 93.
III. The Administrative Separation
¶15       DHS first contends that the Board erred in reversing the ALJ’s legal conclusion that DHS’s employment decision "was not arbitrary, capricious or contrary to rule or law." DHS argues that the Board’s reversal is unsupported by the evidence and lacks a reasonable basis in law because Brown could not perform the essential functions of her position. We discern no error.
A. Legal Principles
¶16       The ADA provides that no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2012); see also § 24-34-402(1), C.R.S. 2015.[3]
¶17       To succeed on an ADA claim, a plaintiff must show: (1) she is disabled, as defined by the ADA; (2) she is a "qualified" individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires; and (3) she suffered discrimination on the basis of her disability. Hannagir v. Utah Dep’t of Corr., 587 F.3d 1255, 1261 (10th Cir. 2009); see 42 U.S.C. § 12111(8) (2012); 29 C.F.R. § 1630.2(m) (2015) (defining "qualified individual"); see also § 2434-402(1)(a) ("[W]ith regard to a disability, it is not a discriminatory . . . practice for an employer to act as provided in this paragraph (a) if there is no reasonable accommodation that the employer can make with regard to the disability, the disability actually disqualifies the person from the job, and the disability has a significant impact on the job."); Cmty. Hosp. v. Fail, 969 P.2d 667, 672 (Colo. 1998) (refining the "qualified individual" prong to account for instances, unlike here, where a disabled individual cannot meet the essential functions of the job and requests a transfer to a vacant position as a reasonable accommodation).
¶18       DHS does not dispute that Brown is disabled under the ADA or that Brown was administratively discharged because of the work limitations caused by her disability. Accordingly, we need only address the second prong — whether Brown is a "qualified individual" who could perform the essential functions of her job, with or without a reasonable accommodation.
¶19       Determining whether a person is qualified under the ADA requires a two-step analysis. First, we decide
whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.
White v. York Int’l Corp., 45 F.3d 357, 361-62 (10th Cir. 1995) (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir. 1993)); see also Hawkins v. Schwan’s Home Serv., Inc., 778 F.3d 877, 889 (10th Cir. 2015); Wells v. Shalala, 228 F.3d 1137, 1144 (10th Cir. 2000).
¶20       We begin by considering whether the Board erred in concluding that CTI and CPR were not essential functions of Brown’s position. See Hawkins, 778 F.3d at 889; Wells, 228 F.3d at 1144; see also Coski v. City & Cnty. of Denver, 795 P.2d 1364, 1367 (Colo. 1990) (first determining whether the employee’s disability prevented her from complying with essential job functions before determining whether a reasonable accommodation existed). If we conclude that the Board did not err, this ends our inquiry and we need not consider whether reasonable accommodations were available. See White, 45 F.3d at 361-62; see also Hawkins, 778 F.3d at 889; Wells, 228 F.3d at 1144.
¶21       Essential job functions are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). They do not include "marginal functions of the position." Id. A job function may be considered essential for any of several reasons, including that (1) the position exists to perform that function; (2) there are a limited number of employees available among whom that function can be distributed; or (3) the function is highly specialized so that the plaintiff was hired for her expertise or ability to perform that particular function. 29 C.F.R. § 1630.2(n)(2). As pertinent here, evidence of whether a particular function is essential includes the following:

 the employer’s judgment;
 written job descriptions prepared before advertising or interviewing applicants for the job;
 the amount of time spent on the job performing the function; · the consequences of not requiring the employee to perform it; · the work experience of past incumbents in the job; and
 the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3); see Hawkins, 778 F.3d at 889.

B. Analysis
¶22       DHS contends that CTI and CPR were essential functions of Brown’s position. Our review of the record reveals that the Board’s conclusion, which relied on the ALJ’s factual findings, that CTI and CPR were not essential functions of Brown’s position, has substantial record support. See Lee, 654 P.2d at 843. In accordance with the considerations in 29 C.F.R. section 1630.2(n)(3), the following facts substantially support the Board’s conclusion, see Ward, 216 P.3d at 93 (we defer to the agency’s fact findings unless clearly erroneous):
 

 Brown’s PDQ reflects that ninety percent of Brown’s position duties were administrative admissions tasks that did not involve CTI or CPR and only ten percent were "supported by" CTI and CPR, in addition to verbal management techniques which Brown could still perform.

 Brown’s PDQ also listed the physical demands, coded by numbers, associated with each of Brown’s duties. All of them, including the CTI and CPR requirements, contained the same physical demand codes: "7, 8, 11, 12," which stand for reaching, handling, talking, and hearing, respectively. Unlike other CMHIP employees, none of Brown’s duty statements contained physical demand code 20, which requires "Control of others – seizing, holding, controlling, and/or otherwise subduing violent, assaultive, or physically threatening persons to defend oneself or prevent injury. Body strength and agility of all four limbs is necessary."

 The PDQ also classified Brown’s position as a "sedentary" position, which involved "sitting most of the time" with "brief periods" of "walking or standing." The PDQ added that the position did not require more than a "negligible" amount of "occasional" physical exertion.

 During her shifts — all graveyard shifts — Brown’s interaction with patients lasted about fifteen minutes and she saw an average of only one to four patients.

 In her three-year tenure in the position, Brown never had to use CTI, CPR, or any other physical management techniques. Indeed, the ALJ found that between 2010 and 2012, "[t]here were no patient take-downs during the graveyard shift on the [a]dmissions unit."

 One of the directors at CMHIP (Brown’s appointing authority) could not recall any instance during her seven-year tenure when any admissions staff had used CTI or CPR.

 Brown was never in the presence of a patient without the company of a police officer.4

 DHS had recently waived the CTI and CPR requirements for another employee as a reasonable accommodation for her knee injury. Unlike Brown, this employee had significantly greater daily contact with patients and her PDQ included the physical demand code "20. Control of others" as a requirement for her position (sixty percent of her position required greater physical demands than Brown’s position).

 The medical staff at CMHIP, including doctors, physician assistants, psychiatrists, nurse anesthetists, and nurse practitioners, who have more daily contact with patients than Brown, were not required to take CTI or CPR training.

 
¶23       This record supports a finding that CTI and CPR were marginal, not essential, functions of Brown’s admissions position. Accordingly, we decline to disturb the Board’s consistent conclusion. See Lee, 654 P.2d at 843; Hogue v. MQS Inspection, Inc., 875 F. Supp. 714, 722 (D. Colo. 1995) ("It is unreasonable . . . to require an employer to accommodate a disabled person by eliminating one of the essential functions of the job.").
¶24       DHS nonetheless urges us to defer to its designation of CTI and CPR as essential job functions. While we agree with DHS that an employer’s judgment about an essential job function "is considered highly probative" and must be given "considerable deference," we do not agree that an employer’s classification is conclusive. See Hannagir, 587 F.3d at 1262; see Hawkins, 778 F.3d at 889 ("[D]espite our usual deference to an employer’s adoption of qualifications based on its judgment and experience, we have firmly held that ‘an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description.’" (quoting EEOC v. Picture People, Inc., 684 F.3d 981, 997 (10th Cir. 2012))).
¶25       And, even giving considerable weight to DHS’s classification of the duties as essential, we still cannot conclude, based on a consideration of the other factors that comprise an essential job function analysis, see 29 C.F.R. § 1630.2(n)(3), that the Board’s conclusion lacked substantial record support. See Ward, 216 P.3d at 91.
¶26       DHS also urges us to consider the "severe" consequences of exempting Brown from the CTI and CPR requirements. DHS contends that Brown would pose a direct threat to the health and safety of others if she is not trained in or able to use CTI and CPR. DHS adds that even though "CTI and CPR are performed infrequently by" admissions liaisons, the "potential consequences of not requiring Brown to perform [them] are high" because newly admitted patients may be volatile.
¶27       Even if we were to accept DHS’s suggestions that the infrequency of a job function is not a significant factor, see Summerville v. Trans World Airlines, Inc., 219 F.3d 855, 858-59 (8th Cir. 2000), and that the risks involved in performing a job task "strike at the heart of another factor used to determine whether a job function is essential," Hannagir, 587 F.3d at 1258-59, we are not persuaded that the Board’s consideration of these factors, in light of the AUJ’s evidentiary findings, constitutes error. The Board concluded that Brown "did not constitute a direct threat" and that "police officers are always present for physical intervention," if necessary. This conclusion has substantial record support, see Lee, 654 P.2d at 843, specifically in the following findings of fact by the AUJ, see Ward, 216 P.3d at 93:

 Three nights a week, Brown was accompanied by another DHS employee who was trained in, and able to use, CTI and CPR.

 Two nights a week, Brown was the only administrative liaison in the unit, but she was never alone with a patient; a police officer was always present.

 The transport service that delivered a patient was not authorized to leave until a hospital police officer retained custody of and searched the patient.

 If no hospital police officers were available in the admissions unit, a department police officer would stand in.

 Brown was never in the presence of more than one patient at a time, and during the entire fifteen-minute admissions process, a police officer was required to be no more than two to four feet away.

 If a patient was uncooperative during admissions, Brown would chart that the patient "refused."

 Again, during her three years in the position, Brown never had to use CTI or CPR.

¶28       Accordingly, we cannot conclude that the Board acted arbitrarily or capriciously, made a decision that is unsupported by the record, erroneously interpreted the law, or exceeded its authority. See Lawley, 36 P.3d at 1247.
¶29       Because we decline to disturb the Board’s conclusion, with record support, that Brown’s disability did not prevent her from performing the essential functions of her job, we need not determine whether a reasonable accommodation existed. See White, 45 F.3d at 361-62; see also Hawkins, 778 F.3d at 889; Wells, 228 F.3d at 1144.
¶30       We affirm the Board’s reversal of the ALJ’s decision. See Lawley, 36 P.3d at 1247.
IV. Brown’s PERA Disability Benefits
 
¶31       DHS next contends that the Board erred in reversing the ALJ’s conclusion on remand that Brown’s PERA disability retirement benefits "must be offset from [her] back pay and benefits." The Board’s reversal explained that the ALJ’s conclusion was "contrary to law because [Brown’s] PERA disability benefits are collateral benefits and cannot count as an offset against [Brown’s] recovery." DHS argues that awarding back pay without an offset for PERA disability benefits misinterprets the law and creates a windfall to Brown. We disagree and affirm the Board’s conclusion.
A. Legal Principles and Analysis
¶32       "Back pay is a ‘make whole’ remedy intended to restore the employee to the financial situation that would have existed but for the employer’s wrongful conduct." Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C., 232 P.3d 277, 283 (Colo. App. 2010) (quoting Davis v. Los Angeles Unified Sch. Dist. Pers. Comm’n, 62 Cal. Rptr. 3d 69, 76 (Cal. Ct. App. 2007)).
¶33       At a minimum, an award of back pay includes the employee’s base salary amount with pay raises the employee reasonably expected to receive during the back pay period. Bonidy, 232 P.3d at 283. Then, the employee’s earnings during that period, including some collateral sources of compensation for the loss, are subtracted from the award to offset the employer’s liability. § 13-21-111.6, C.R.S. 2015 (providing for an offset to a damage award if the injured party has been compensated for his loss by any person, corporation, or insurance company).
¶34       In certain circumstances, however, an employee may be eligible for a full recovery from an employer — and the award protected from an offset — even though the employee has received compensation, in full or in part, from a collateral source. Wal-Mart Stores, Inc. v. Crossgrove, 2012 CO 31, ¶¶14-16; Van Waters & Rogers, Inc. v. Keelan, 840 P.2d 1070, 1074-80 (Colo. 1992); McLaughlin v. BNSF Ry. Co., 2012 COA 92, ¶54 (citing Green v. Denver & Rio Grande W. R.R. Co., 59 F.3d 1029, 1032 (10th Cir. 1995)); Tech. Comput. Servs., Inc. v. Buckley, 844 P.2d 1249, 125355 (Colo. App. 1992). Specifically, section 13-21-111.6 allows full recovery when the employee has received compensation from a collateral source "as a result of a contract entered into and paid for by or on behalf of such person."
¶35       The parties cite to no Colorado appellate decision, and we have found none, addressing whether PERA disability benefits are considered benefits from a collateral source that are not subject to an offset from the damage award. But see Renteria v. Dep’t of Labor & Emp’t, 907 P.2d 619, 622-23 (Colo. App. 1994) (concluding that the Board did not abuse its discretion in offsetting the employee’s damage award to account for PERA benefits but not addressing whether PERA benefits fall within the collateral source exception). Our courts, however, have addressed similar issues.
¶36       In Van Waters & Rogers, Inc., 840 P.2d at 1074, the Colorado Supreme Court analyzed the breadth of the collateral source rule and the contract exception. In that case, a tortfeasor injured a firefighter and, as a result of his injuries, the firefighter became occupationally disabled. Id. at 1072. The firefighter began receiving disability payments from his pension fund. Id. The tortfeasor sought to reduce the firefighter’s damages award by the amount of this compensation. Id. The tortfeasor argued that the disability benefits were not entitled to protection against a setoff because the firefighter’s payments resulted from legislative appropriation, rather than from a contract through which the firefighter paid premiums. Id. at 1078. The court disagreed and held that "the [contract] exception clause is broad enough to protect benefits that result from an employment contract for which a person gives consideration in the form of services." Id. The court added that the legislative history of section 13-21-111.6 reflects a concern that "a tortfeasor should not receive the benefit of an offset from payments received by the injured party or that party’s heirs from sources such as retirement benefits, disability benefits, and life insurance." Id. at 1077.
¶37       Here, too, Brown’s eligibility for PERA disability benefits depended on her past services rendered. See § 24-51-704, C.R.S. 2015. PERA, not DHS, is the instrumentality of Colorado responsible for administering retirement and disability benefits on behalf of eligible state employees, like Brown. See §§ 24-51-201, - 202, C.R.S. 2015; Lawless v. Standard Ins. Co., 2013 COA 153, ¶¶3-4. Payments are calculated and disbursed based on the employee’s "service credit accumulated up to the date of disability." § 24-51-704.
¶38       We recognize that, unlike the disability payments in Van Waters & Rogers, Inc., which were collected and disbursed from a source wholly independent from the tortfeasor, DHS contributes to the PERA disability program. See Wal-Mart Stores, Inc., ¶¶9-11 (discussing how a damage award is protected against an offset when an employee is compensated for her loss by an entity to which the employer did not contribute). And, the record reflects that DHS contributed to Brown’s PERA account. See also § 8-76-111, C.R.S. 2015; Renteria, 907 P.2d at 623. Colorado courts have determined, however, that this type of employer contribution scheme should not, in and of itself, preclude an employee’s recovery from the employer. See, e.g., Tech. Comput. Servs., Inc., 844 P.2d at 125355.
¶39       In Technical Computer Services, Inc., another division of this court concluded that unemployment compensation benefits are collateral benefits that should not offset a plaintiff’s base pay award even though the employer contributes to an unemployment insurance fund. Id.; see Renteria, 907 P.2d at 622-23 (concluding that PERA retirement benefits, to which an employer contributes, are akin to unemployment compensation). The division reasoned that unemployment compensation benefits are paid by the state, out of state funds derived from taxation, and, although these taxes are paid by employers, "it is the fund itself, a collateral source, which is the immediate recipient of the monies paid." Tech. Comput. Servs., 844 P.2d at 1254-55. The division then aligned with numerous other jurisdictions that have similarly held that the receipt of unemployment compensation benefits should not diminish a damage award, regardless of the employer’s contribution. Id. at 1254; see, e.g., Sporn v. Celebrity, Inc., 324 A.2d 71 (N.J. Super. Ct. Law Div. 1974); see also Green Forest Pub. Schs. v. Herrington, 696 S.W.2d 714 (Ark. 1985); see also Green, 59 F.3d at 1032 ("Our cases have always treated payments from the public treasury, at least when funded by a tax scheme to which the injured party contributed, as from a collateral source.").
¶40       PERA disability retirement funds are similarly collected and paid. Although the employer contributes to PERA, the contribution is required. And, as pertinent here, disability retirement funds are paid to employees directly by PERA, not by the employer. See §§ 24-51-201, -202, -401, C.R.S. 2015; Lawless, ¶¶3-4 (explaining the PERA contribution scheme). Indeed, PERA regulation 8 Code Colo. Regs. 1502-1:7.77(A), provides that PERA, a public entity governed by state statutes, "shall determine the amount payable as the monthly disability retirement benefit, if any, and shall pay it."
 
¶41       Moreover, Colorado courts have concluded that other governmental sources — Social Security Disability Insurance (SSDI) benefits, Medicaid, and unemployment compensation — constitute collateral sources not subject to an offset from an employee’s base pay award even though the employer has contributed to them. Smith v. Kinningham, 2013 COA 103, ¶¶14-17; see Barnett v. Am. Family Mut. Ins. Co., 843 P.2d 1302, 1309-10 (Colo. 1993) (permitting double recovery because SSDI benefits are the result of a contributory insurance system rather than gratuities or public assistance); Kistler v. Halsey, 173 Colo. 540, 545-46, 481 P.2d 722, 724 (1971) (The doctrine permitting double recovery is "applicable where the source of compensation is wages paid by an employer under an employment rule or policy providing for sick leave and accumulation thereof."); McLaughlin, ¶¶57-58 (concluding that Railroad Retirement Act disability benefits were a collateral source, and rejecting the defendant’s argument that its contributions to those benefits made them noncollateral and citing Eichel v. N.Y. Cent. R.R. Co., 375 U.S. 253, 254 (1963)); see also Berg v. United States, 806 F.2d 978, 986 (10th Cir. 1986) (concluding that Medicare benefits are a collateral source that should not reduce a plaintiff’s award).
¶42       We align with these cases in concluding that, under these circumstances, PERA disability benefits also constitute a collateral source not required to be offset from a damage award.
¶43       DHS does not argue against, or even mention, the application of the collateral source rule. DHS asserts, however, that Brown’s PERA disability payments should be offset from her base pay award because concluding otherwise would permit a windfall of recovery to Brown. But, under the collateral source rule, "[t]he plaintiff may receive benefits from the defendant himself which, because of their nature, are not considered double compensation for the same injury but [are] deemed collateral." McLaughlin, ¶59 (citation omitted). This is so because "public policy favors giving the plaintiff a double recovery rather than allowing a wrongdoer to enjoy reduced liability simply because the plaintiff received compensation from an independent source." Id. (quoting Green, 59 F.3d at 1032).
¶44       In addition, our conclusion may not always result in a windfall to plaintiffs because they may have to subrogate PERA for the funds. As Brown contends, PERA is expressly authorized, under section 24-51-205(3), C.R.S. 2015, to recover any amount paid in benefits from an award of back pay in wrongful termination cases. But see § 24-51-205(3.5) (permitting PERA to settle or compromise any dispute involving such recovery). And, PERA regulation 8 Code Colo. Regs. 1502-1:7.77(B), adds that any plaintiff who receives an award of back pay for PERA-covered employment "shall not be permitted to retain . . . any disability retirement for the same period as the claim." See also Wal-Mart Stores, Inc., ¶16 (explaining how the subrogation obligation often prevents a plaintiff’s double recovery).
¶45       For these reasons, we conclude that the Board’s conclusion — that Brown’s PERA disability payments were a collateral source that "cannot count as an offset against Brown’s recovery" — has a reasonable basis in law and does not constitute error.
V. Conclusion
¶46       The Board’s orders are affirmed.
JUDGE TAUBMAN and JUDGE MILLER concur.

[1] The record reflects that the injury occurred in 2007 while Brown was employed in another position at CMHIP — a position she held for ten years before being promoted to admissions liaison.
[2] The AUJ’s remand order reflects that while on leave, Brown collected monthly PERA disability benefits, unemployment insurance benefits, and wages from substitute employment.
[3] Whenever possible, CADA should be interpreted consistently with the ADA. Tesmer v. Colo. High Sch. Activities Ass’n, 140 P.3d 249, 253 (Colo. App. 2006). See Dep’t of Regulatory Agencies, 3 Code Colo. Regs. 708-1:60.1(A) (CADA is "substantially equivalent" to the ADA).
[4] The record reflects that the hospital police officers, security officers, and transport service providers were trained in CTI and CPR every two years.